IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

FRED HOFFMAN, III,                     §
   Plaintiff,                          §
v.                                     §     CIVIL ACTION NO. 2:18-CV-333
                                       §
JEFFERY RICHARDSON, et al.,            §
   Defendants.                         §

---

PLAINTIFF'S SUPPLEMENTAL EXHIBIT ZZ TO AMENDED MOTION FOR TRO &
PRELIMINARY INJUNCTION FOR PLAINTIFF TO BE RETURNED TO THE
MCCONNELL UNIT

---

BRIEF DESCRIPTION: Plaintiff's Declaration in Opposition to the
Defendant's DE No's 93 and 100

TOTAL PAGES WITH COVERSHEET: 35

DESCRIPTION: This is the Plaintiff's Declaration in Opposition to
the Defendant's Motion to Dismiss as Moot, and the
Defendant's Response to the Plaintiff's TRO. DE No's
93 and 100.

Please read for more details.

---

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| FRED HOFFMAN, III, | § | |
|   Plaintiff, | § | |
| v. | § | CIVIL ACTION NO. 2:18-CV-333 |
| | § | |
| JEFFERY RICHARDSON, et al., | § | |
|   Defendants. | § | |

PLAINTIFF'S DECLARATION IN OPPOSITION TO DEFENDANT RICHARDSON'S
MOTION FOR SUMMARY JUDGMENT (DE No. 93) & DEFENDANT'S RESPONSE TO
PLAINTIFF'S EMERGENCY MOTION FOR A TRO AND PRELIMINARY
INJUNCTION TO BE RETURNED TO THE MCCONNELL UNIT (DE No. 100))

FRED HOFFMAN, III, states:

01. I am the Plaintiff in the above-entitled case. I make this declaration in opposition to the Defendants' Motion for Summary Judgment & his Response to my filing for a TRO and Preliminary Injunction to be returned to the McConnell Unit, as the information herein is relevant to both filings by the Defendant.

02. The Defendant is filing for Summary Judgment that this case is now moot, since the Plaintiff was moved to the Bill Clements Unit, and opposes the fact the Plaintiff is trying to have an ORDER generated to return him to the ML Unit. What the Defendant fails to understand is that this case is for an **"Ongoing Campaign of Harassment"**, that includes acts of retaliation; and that an act of retaliation is the ONLY true reason the Plaintiff was moved to another unit.

03. The Defendant did NOT file an affidavit in support of his Summary Judgment motion, and relies on a screenshot capture of the TDCJ mainframe (DE No. 93-1).

04. The Defendant did file an affidavit from DAVID BLACKWELL, Region V Director, along with additional screenshot captures of the TDCJ mainframe, in his response to the Plaintiff's request for a TRO, and due to this the Plaintiff will address both sets of exhibits in his responses. (DE No. 100-1).

PAGE 1

05. That affidavit from the Defendant was filed by someone who does not work for the State Classification Committee, was not involved in the decision to move the Plaintiff, has no personal knowledge of the Plaintiff's medical conditions, and has no true knowledge of the Plaintiff's situation. He has simply relied on screen shots of the TDCJ mainframe that claim falsely that the Plaintiff is being moved due to being heat sensitive.

06. For that reason and more, the Plaintiff now files his own affidavit and EXHIBITS A-FF (DE No. 111-1 thru 111-5); EXHIBITS 01-14 (Sealed Exhibits), and EXHIBITS GG-ZZ (Supplemental Exhibits) in support of his declaration and his responses to the Defendant's dispositive filings (De No's 93 & 100).

07. This response will also prove the falsehoods and misrepresentations made in Mr. Blackwell's affidavit for the Defendant.

08. First, the Plaintiff needs to address one issue over the fact he cannot control false information from entering his medical & TDCJ records, and that this Honorable Court should not hold that against him. For example, in the medical records it claims that the Plaintiff suffers from two heart attacks & cardiovascular disease, and neither is true.

09. The Plaintiff discovered during the discovery of medical files in his cases 2:18-CV-336 & 2:18-CV-328, that he did NOT suffer heart attacks at his other units (Gurney & Bryd). He was lied to by staff, made to believe he did, and medical evidence show this to not be true. They show the incidents were both basically large scale panic attacks that induced pain, and EVERY SINGLE EKG the Plaintiff now has in his records is clear & shows NO EVIDENCE of ever suffering a heart attack.

10. Upon his arrival to the McConnell Unit medical provider HUDSON & WHITT claimed since he had two heart attacks he had to have cardiovascular disease, and added that to his records, even though he has neither.

11.  Also due to this false information he was prescribed both NITROGLYCERIN & ISOSORBIDE for supposed chest pains. First, due to the false information he was provided the NITROGLYCERIN for years. Then when he had persistent chest pains years later, the ISOSORBIDE was added as well. However, the diagnosis was not correct, as the pains persisted.

12.  The Plaintiff would at this time be also medicated for acid reflux and intense stomach pains & issues for years; which was also misdiagnosed. As it turned out the Plaintiff was suffering from severe & complicated symptoms from contracting H-pylori on the McConnell Unit, and once he was given the proper treatment for that, ALL of those chest & stomach pains disappeared. The chest pains were NEVER related to anything to do with the Plaintiff's heart.

13.  The Plaintiff quit taking NITROGLYCERIN years ago, as all it does is give the Plaintiff migraines, and quit taking ISOSORBIDE after being cured from the H-Pylori symptoms, as neither medication is ever been needed. However, they are still on his records, it still shows he supposedly had two heart attacks, and none of that is true.

14.  The Plaintiff gives this as just one example of why both medical & TDCJ records that bear false informatin should not be used against the Plaintiff, as he has no control whatsoever over what content is entered into them.

15.  Now the Defendant is NOT entitled to Summary Judgment in this case, because there are genuine issues of material fact to be resolved. This will now be addressed in the below set out subject matters, and I will organize this as well.

I. THE DEFENDANT'S CLAIMS THAT THE MOVE WAS CAUSED BY HEAT SCORES IS FALSE

16.  The Defendant's repeated use of TDCJ's mainframe screenshots as his defense, should have inlcuded this FACT: On 02/02/2021 the day prior to the move being done the mainframe showed that Plaintiff's Unit of Assignment was the McConnell Unit, and under Comments it stated the reason: "BENCH TRIAL", as I

read it off the mainframe with my own eyes. I was in medical on the McConnell Unit trying to figure out where & why they were claiming I was heat sensitive, and a nurse logged into the mainframe in front of me, while she tried to find out why the restrictions where there.

17. I have had medical staff on the McConnell Unit, Darrington Unit, Huntsville Unit, Robertson Unit, and Bill Clements Unit; try and figure that out. On every occassion I am being told that medical did NOT put the restrictions there, that they do not understand the codes even being used, and that TDCJ put those there not the medical department.

18. Now the Plaintiff is going to apologize in advance to this Honorable Court and the Defendant, but being PRO SE, the Plaintiff does not know how to provide a more narrow version of the events, and apologizes forthe length & possible redundancy of his filings & information in this affidavit. The Plaintiff is just trying to protect his interests in the best method possible, with his limited knowledge of the law.

19. First, the Plaintiff is going to explain the ways that heat restrictions, heat sensitivity scores, and common comorbidities that may affect heat tolerance can get someone moved to a unit with cool beds. This is being done to show that over the years the Plaintiff's conditions & scores were not a risk factor.

20. The first of these are the Plaintiff's actual designated **"Current Patient Restrictions"**, which lists out all of the current possible restrictions that the Plaintiff may have due to conditions or the medications he is taking. The Plaintiff provides a comprehensive look at these in his EXHIBITS L, HH, JJ, LL, MM, and OO. This covers the years of 2017 until 2021, in those EXHIBITS.

21. These restrictions themselves can also affect the overall heat scores, so they are very relevant to the issue at hand. Especially since the Plaintiff can prove his restrictions were added by TDCJ staff, not medical staff.

22.  Back in May 2017, the Plaintiff was taking medications unknown to him at the time that are commonly associated with heat stress, and could make him more susceptible to issues with heat & direct sunlight as well. They were TRAZADONE, CARBAMAZAPINE (Tegrotol), VENLAFAXINE (for neuropathy pain), & SPIRONOLACTONE (a diuretic). SEE: EXHIBIT GG.

23.  Being on those medications rose his heat sensitivity scores, along with the restrictions he had at the time. However, in July 2017, the Plaintiff did NOT have temperature extreme restrictions on his list. SEE: EXHIBIT HH.

24.  MAJOR MCKEE however approved that every inmate on 8 building back then was allowed to own two fans for providing a way to cool off more. But once I bought my second fan it was confiscated for having to many. So I filed a PROPERTY claim for the return of the fan, my grievance had NOTHING to do with medical issues, it was against TDCJ for the confiscation of the fan, not medical.

25.  This grievance is identified as 2017113445, and the Defendant's counsel has provided the Plaintiff with the entire file on it as part of the discovery in case 2:18-CV-336, along with the information contained in EXHIBITS HH, II, JJ, KK, & LL. This evidence proves what I have been claiming all along, that TDCJ staff, not medical staff, added the restriction.

26.  Please read EXHIBIT II's coverpage, and the EXHIBIT at this time. It will prove how the Plaintiff's "NO TEMPERATURE EXTREMES" & "NO WORK IN DIRECT SUN-LIGHT" restrictions were added, as a result of a PROPERTY claim, by TDCJ.

27.  These restrictions being added raised the Plaintiff's heat sensitivity score as well, they are shown in EXHIBIT II, pg. 11 (marked HOFFMAN-2948), and are now at the highest level the Plaintiff has ever had in ten years.

28.  So at no time were these restrictions added by a "medical provider" as the Defendant claims in his Motion and his submitted affidavit, they were

added by TDCJ staff investigating the issues with a <u>PROPERTY</u> claim grievance, filed by the Plaintiff over the loss of one of his fans, nothing more.

29.  If you look now at EXHIBIT JJ, you will see how the restrictions have been updated, to include new heat & direct sunlight restrictions. So now this has also updated the heat sensitivity scores of the Plaintiff to their highest level in ten years, as seen here & on pg 11 of EXHIBIT II. It look like this:

| PULHES Management | | | |
|---|---|---|---|
| | DESIG | CODE | MODIFIER |
| P | 3 | C | P |
| U | 1 | A | . |
| L | 1 | A | . |
| H | 1 | A | . |
| E | 2 | B | P |
| S | 2 | B | T |

30.  You will also be able to see my heat scores in EXHIBITS LL, MM, and OO.

31.  The Plaintiff has tried to remove these restrictions ever since, and the McConnell Unit medical staff refused to do so, because they were "...put there by TDCJ, not us...."

32.  Now I am showing in EXHIBIT KK the current medications I was on, to show they do NOT differ from EXHIBIT GG, and this proves the INCREASE in my scores was done by the adding of the restrictions.

33.  In 2018 the psychiatric provider saw that I was on VENLAFAXINE from medical staff, which doubles as a psych drug, and added even more restrictions to my list as shown in EXHIBIT LL.

34.  So in 2018 I have EVERY SINGLE restriction for heat there is, and my score is the <u>highest</u> it has ever been as well. So why is this relevant? It is because of the ruling in COLE v. COLLIER in U.S.D.C., S.D., Houston Div., 4:14-CV-1698.

35.  TDCJ is taking on alot of pressure over the lawsuit for air conditioning, and that case starts a cycle of inmates that have heat restrictions, that have heat sensitivity scores that are deemed a risk factor, to be moved to units with "cool beds", basically air conditioned cells.

36.  So in March - May of 2018, TDCJ & the McConnell Unit move over 200 inmates off the unit, to units with cool beds, and at that time the Plaintiff has EVERY heat restriction there is & his scores are the highest they have ever been.

37.  However, the Plaintiff's risk factor is not high enough to cause concern, and he is not moved. This is even though inmates with LESS restrictions than the Plaintiff are moved to other units. This makes the Plaintiff believe what he knows to be true already, that he is not a risk for being moved.

38.  Those 200 plus inmates are moved off in groups 25-50 at a time, and are going to units all over the State. When they are done, there are no serious heat restricted inmates on the McConnell Unit left.

39.  Now as the Plaintiff already has discussed at length, he has been watching how TDCJ handles lawsuits for injunctive relief for ten years, and how it is considered 'business as usual' to move inmates not requesting damages, to be able to have the lawsuits dismissed as MOOT. So that being said, and the fact that the Plaintiff is planning the filing of cases 2:18-CV-235, 2:18-CV-328, 2:18-CV-333, and 2:18-CV-336 at that time, he decides to make sure that for NO possible reason can he be moved, as a reason to get his cases dismissed.

40.  I start doing extensive research into my medications, as is shown in DE No. 89, to make sure that medications I am on do not cause heat stress, or will possibly affect my heat scores & tolerance. I do not want to give TDCJ-CID & the Defendants an excuse to move me, that actually has merit.

41.  First, I ensure that my Original Complaint has a section titled "NOTICE OF PRE-EMPTIVE RETALIATION", pg. 26, no's 59-61, to let this Court know.

42. This details out that any type of move done to the Plaintiff after the filing of this suit, that the Defendants are on notice that this is an act of retaliation.

43. The TDCJ State Classification Committee placed the Plaintiff on the ML UNit ten years ago, because it was the safest enveironment for him & was the best fit for his medical diagnosis. This has remained constant until   it was discovered that the Plaintiff was in settlement negotiations, and they were for injunctive relief ONLY.

44. The first thing I discovered in regards to my medications was about my NORTRIPTYLINE and TRAZADONE. They both were considered medications that will raise my heat scores and make me susceptible to heat stress & reduce my heat tolerances. I had them both replaced with other medications to ensure that they would not have a chance to affect my heat scores.  SEE: EXHIBIT MM, it shows updated heat restrictions AFTER their removal, and three restrictions are completely gone. This reduced my heat scores as well.

45. Third, I let TDCJ staff on the McConnell Unit think that my lawsuits are filed for damages, when they bring them up I talk about the thousands of dollers I will win in them as a way to distract from the fact there are NO types of damages in my suits. From experience in assisting others with their cases, or my previous cases in State court, I know that unit staff do NOT maintain direct & constant contact with the Asst. Attorney General assigned to their case, so all their information comes from the 'rumor mill' on the unit or me.

46. This works for years during the course of the litigation in my cases, and after having detailed conversations with multiple Wardens, Majors, and other unit staff, they are all oblivious to the fact I am not suing for money.

47. I discuss this strategy in far more detail in my letters to counsel, that are attached as EXHIBITS 07 & 08, please read them now.

PAGE 8

48.  So now we are to March - May of 2019, TDCJ & the McConnell Unit move over 100 more inmates off the unit, to units with cool beds, and at that time the Plaintiff has LOWERED his heat restrictions & scores, from that of 2018.

49.  Once again, the Plaintiff's risk factor is not high enough to cause concern, and he is not moved. This further solidifies that the heat risk factor for the Plaintiff is not serious enough to have him moved to a cool bed unit.

50.  Those 100 plus inmates consist mainly of new arrivals since the 2018 mass move, but also include a few inmates that had further medical progression of their own heat related issues. When they are done, once again, there are no serious heat restricted inmates on the McConnell Unit.

51.  Also key to note with the addition of the Respite area program, it has allowed the Plaintiff to not suffer one heat or sunlight induced seizure in the summers of either 2018 or 2019. SEE EXHIBIT XX.

52.  The 100 plus inmates are moved off again in groups of 15-20 at a time, and are going to units all over the State.

53.  In 2019, is also when the Plaintiff ensures that other medications are removed that affect heat stress & tolerance. They are: CARBAMAZIPINE (Tegrotol), VENLAFAXINE, & PROMETHAZINE, which are all named in TDCJ's CHMC D-27.2, as meds associated with heat stress. This again LOWERS his heat restrictions & scores, as they are all replaced with medications that do not affect heat stress.

54.  At this point medical staff confirm that the Plaintiff is not taking any other medications that should affect his heat scores or restrictions.

55.  Now we are to 2020, and quite a few things happen here. In March, to the dismay of every inmate that remembers her, EVELYN CASTRO returns as the Head Warden for the unit. Also in March, the third migration of heat restricted inmates to units with cool beds begins. This time there are only 45-60 of them.

56.  Those 45-60 inmates consist again of mainly new arrivals since 2019, but there are a few that had further medical progression of their own heat related illnesses. The 45-60 plus inmates are moved off the unit in groups again of 10-15 at a time, and are going to units all over the state. When they are done, once again, there are no serious heat restricted inmates on the McConnell Unit.

57.  Once again, the Plaintiff's risk factor is not high enough to cause any concern, and he is not moved. This further solidifies that the heat risk factor for the Plaintiff is not serious enough to have him moved to a cool bed unit.

58.  I filed EXHIBIT NN to show the removal of medications TRAZADONE, PROMETH-AZINE, VENLAFAXINE, CARBAMAZIPINE (Tegrotol), & NORTRIPTYLINE; prior to the Plaintiff being moved, which further proves the LOWERING of the Plaintiff's heat restrictions & heat scores as well.

59.  However, one new thing happens this summer of 2020, with the return of EVELYN CASTRO, one of the original Majors who started the ongoing Campaign of Harassment against the Plaintiff decides that I should be targetted with not allowing me access to the respite areas, even though I had access all of 2018 and 2019 without a single interruption.

60.  CASTRO has hated me for years, assisted ADAM GONZALEZ in retaliating on me (SEE EXHIBITS SS, TT, & UU), cannot stand that I am a Jailhouse Lawyer, has told me that to my face herself, told me to stay away from her (in regards to a grievance or court of law), and with her decision to deny me access, makes sure I suffer my first heat related seizure in years.

61.  I document the denial of access to the respite areas in EXHIBITS M, N, & O. However, at every turn those complaints are ignored by TDCJ, so they are not a deciding factor of any kind, in regards to heat related issues for me. Please read those EXHIBITS at this time.

PAGE 10

62.   Because it is a known fact that CASTRO is protected from very high levels of State government officials, and again from very high echelons of TDCJ's Regional Directors and up; is why I decide to start briefing my attorney on the risk of a retalitory transfer, and how to prevent it. CASTRO has been arrested repeatedly for Driving While Intoxicated throughout her career, and back when she was a Major on the ML Unit, the Regional Director had to bail her out, all showing how high she is protected. SEE EXHIBITS 01-14.

63.   I had not been worried about a possible retalitory transfer until CASTRO showed back up as Warden. She does not care what is being litigated, she just reacts. Her history in TDCJ proves this time and time again. With her back is why I start checking into my medications again, just to make sure I am not at any risk for being moved.

64.   Medical staff confirms once again that I should not be subject to any type of medical transfer, and confirm if I was I would have already been moved.

65.   The Defendant further claims in his Motion and the Affidavit that I was moved **"because it was determined by his medical provider that he has a heat score requiring him to be housed in a cell with a cool bed."**, which is a flat out lie.

66.   I have already made it a matter of record about how medical providers on the McConnell Unit do <u>NOT</u> discuss the triggers for my seizures, they do <u>NOT</u> discuss my having heat related issues of any kind, they do <u>NOT</u> discuss my supposedly having any common comorbidities that would cause me to be moved for heat related issues, and the only thing we continually discuss about heat is the fact I am trying to REMOVE the heat restrictions placed on me by TDCJ in Grievance 2017113445 (EX. II). SEE: U.S.D.C., S.D., Corpus Christi Division, HOFFMAN v. EVELYN CASTRO, Case No. 2:18-CV-328, DE No. 87, pg. 9, par. 3.

67.   At no time has a medical provider ordered for me to be housed on a unit

with a cool bed. At no time would a medical provider, who knows I am trying to remove false heat restrictions from TDCJ to begin with, then add in an order for me to be moved due to those false restrictions. Every provider on the ML Unit knows I am in active litigation and want nothing to do with it, if they had issued such an order, they would have immersed themselves in something they wanted nothing to do with.

68. Now out of the common comorbidities named in TDCJ's CHMC D-27.2 (EX. Y), there are three that TDCJ could try to imply apply to me, but I will show now how that is impossible. Also had these been an issue I would have been moved back in 2018, not 2021.

69. Those three are: Cardiovascular Disease, Diabetes, and Psychiatric conditions. Now the first one is easy, as I already discussed that earlier. I have never had a heart attack, every single EKG for nine years is clear, and the only reason that was added to my chart is because I supposedly had a heart attack, which I did not.

70. The next one is Diabetes, which my conditions & degree of danger is not progressed to a level that would require a cool bed, or anything close to that. In fact, the only reason that I take insulin injections for my diabetes is due to the fact I am allergic to the pill Metformin (Biguanides), which could control my diabetes without injections.

71. For my diabetes to reach that level my body's ability to move blood to the heart or brain, has to be impaired, and then causing disruptions in my body's response to heat. Another way is if my diabetes impairs my kidney functions, and that they fail to maintain a salt-water balance as a response to heat. None of that is in my medical records, and NONE of that is part of my diagnosis. So my diabetes cannot be a contributing issue for moving me to a cool bed.

72. The next one is Psychiatric Conditions, which my diagnosis is for Post-

Traumatic-Stress-Disorder, not for anything like depression or anxiety. My PTSD
does not adversely affect my mood, thinking, or behavior during a period of
heat stress. That type of conditions, like depression or anxiety, do have heat
related issues, because it causes those tpes of patients to not be able to
communicate well with others, or have problems taking care of themselves. That
is why psychiatric conditions are listed, but my diagnosis has absolutely not
one thing to do with that. Also I am not even medicated anymore for my PTSD.
My treatment for my military based PTSD was group therapy, individual treatment
from a prior military mental health expert, and classes on how to control my
PTSD, all of which were offered on the McConnell Unit. They are NOT offered
on the Bill Clements Unit, and by being moved I am denied treatment.

73. So it is obvious my common comorbidities have nothing to do with my heat
scores, my medications have nothing to do with my heat scores & restrictions,
and my heat restrictions have nothing to do with my heat scores.

74. This is why the Defendant relied on simple screenshots of a mainframe,
that prove absolutely nothing, but the fact someone in TDCJ entered into the
system a false heat sensitivity score for me. Also that is why the Defendant
backed up that information with an affidavit from a person who just read the
screen of false information, he does not work for the State Classification
Committee, was not involved in the decision to move the Plaintiff, has ZERO
personal knowledge of my medical conditions, and has no true knowledge of my
actual situation & diagnosis.

75. This is why the Defendant submitted not one medical record to back his
claims, did not disclose any true medical facts behind the decision to move
me, and my substantial exhibits prove that my medical FACTS & diagnosis have
nothing to do with my being moved to the Bill Clements Unit. There is not one
bit of truth to the claims in the Defendant's motion and his affidavit. Also
if he wants to rely on the mainframe screenshots he should produce the shot

from prior to the move being done, that shows my assignment being due to a "BENCH TRIAL", as I saw with my own eyes on 2/2/21.

76.  There is not one single medical truth to the claim that I was moved to a far more violent unit, for a medical reason of heat sensitivity scores.

77.  Now I will discuss the next false statement in the affidavit, and that is repeated in the motion. That is the claim about Administrative Segregation on the McConnell Unit having cool beds, and I needed to be rehoused because I can not be housed in that security group.

78.  First, I will explain the levels of security for housing in TDCJ, so the Court can understand what the Defendant is referring to. Here is a breakdown from the highest to the lowest housing assignments for inmates in TDCJ:

1) Death-row

2) High Security

3) Administrative Segregation

4) G5 custody housing - General Population

5) G4 custody housing - General Population

6) G3 custody housing - General Population

7) G2 custody housing - General Population

8) G1 custody housing - General Population

79.  So at the time of being moved the Plaintiff lived in housing level (5), as he was a G4 at the time. He had access to multiple rights & privileges that he is now denied. Once the order for the cool bed came down, the Defendant is claiming that the only cool beds on the McConnell Unit are in housing level (3), Administrative Segregation; and that is why I had to be moved.

80.  The Defendant claims that I did not meet the requirements of the type of inmate that is housed in Administrative Segregation, but what he fails to even mention is that for the past three years the Administrative Segregation bldg.,

PAGE 14

on the McConnell Unit, has been housing inmates who need a cool bed, that are supposed to be living in housing levels (7), (6), (5), and (4). The building is also used for overflow housing for over seven years for housing levels (7), (6), (5), and (4).

81. So that is absolute lie that I could not have been housed there for access to a cool bed, and should have, especially with my housing in the mainframe showing under the reason for my being on the McConnell Unit as for a **"BENCH TRIAL"**.

82. Now as you go up the list of the housing levels, every time you go up it, you lose access to rights & privileges that were afforded you at the lower one. That is very important to understand as I explain this next part.

83. After being on the Bill Clements Unit for two weeks I was upgraded from housing level (5), to housing level (7), because I was upgraded from a G4 to a G2 custody level. This is the best level I can reach as the length of my sentence prevents me from reaching housing level (8) at all.

84. However, instead of being placed in a cool bed in housing area level (7), I have been confined the entire time I have had a cool bed to housing level (2), which is FAR WORSE than housing level (3), which I was denied on the ML Unit.

85. I am just one level away from the security level of Death-row, all because of this false heat score, entered into the system over a property grievance in 2017, and then furthered by CASTRO herself who had the move manipulated from the State Classification Committee, to get rid of me.

86. I spend on average at least 22 hours a day locked in a cell, no access to the dayrooms or phones after 5PM, no access to recreation at all, and much more.

87. The Defendant has NOT submitted one ounce of real evidence that proves or shows the true reasons for my move, his affidavit is full of lies, and I have shown with my evidence the truth of the matter to this Court.

88.  Now since my arrival on the Bill Clements Unit, I have now been able to see a medical provider for the first time in ten years, that is <u>NOT</u> a member of UTMB medical staff, and is not a member of TDCJ's staff. Mr. Keeter is a member of the Texas Tech medical staff, as there is a different contract up here in Amarillo. This also goes for my seeing a pscychiatric provider as well, I was able to see BC Correctional Psychiatrist Que Nguyen for my PTSD.

89. After my visit with Ms. Nguyen she agreed with my reasons for removing my ZIPRASIDONE (Geodon) for part of my treatment, as the side-effects are to much, and I had quit taking the medication before my arrival anyway. So I am not on any psychiatric medication at all now.

90.  Mr. Keeter and I went over the medications I was on, the heat restrictions that should not be there, and my overall diagnosis. He agreed with me as well on the heat restrictions, and removed them all. SEE: EXHIBIT OO. Then he also agreed that some of my medications, even though they should not be, could be used as an excuse to raise my heat sensitivity scores. So he agreed to remove the ATENOLOL & replaced it with AMLODIPINE, which does not raise the scores; then he agreed to remove the HYDROCHLOROTHIAZIDE (diuretic, that I quit taking in 2019), ISOSORBIDE (for chest pain from a heart attack I did not have), and LISINOPRIL (a beta blocker, that I quit taking in 2016).  SEE: EXHIBIT PP.

91.  The ATENOLOL, HYDROCHLOROTHIAZIDE, & Heat restrictions were removed on the 22nd of March, 2021, by Mr. Keeter. He forgot to remove the ISOSORBIDE and the LISINOPRIL, and I have a follow-up appointment scheduled now to do that. Then the ZIPRASIDONE (psych) was removed a couple of weeks later by Ms. Nguyen.

92.  I should have never had to go through all this mess though, as my scores were never high enough to move me in 2018, 2019, or 2020, and my scores were higher back then, than they are now. There was never a true heat score to move me, and any claim otherwise is a lie.

PAGE **16**

## II. THE DEFENDANT'S CLAIMS THAT THIS CASE IS NOW MOOT IS FALSE

93.  This suit was filed originally for the "Defendants created an environ-
ment to ensure a Campaign of Harassment was allowed to be carried out un-im-
peded by unit staff." DE No. 01, pp. 8, No. 32. It also identified that the
"Campaign of Harassment consisted of, but is not limited to the following:
harassment over my religious beard, harassment for my redressing grievances,
filing false disciplinary cases, ordering other unit staff to write more false
disciplinary cases, treatment that was unjustifiably humiliating, frightening,
degrading and anti-ethical to human dignity in regards to the assault & battery,
legal papers were confiscated and/or destroyed which impaired the Plaintiff's
ability to present his case effectively in State court and was both interference
and denial of access to courts, the intentional destruction of Plaintiff's type-
writer in an effort to frustrate, forestall, impede and curtail my access to
the courts." DE No. 01, pp. 8-9, No. 33.

94.  The Original complaint goes on to detail out the action of a "Ongoing Cam-
paign of Harassment", that I have been subjected to over a course of years. In
the relief requested I ask for: "The immediate cessation of all acts involved
in thee ongoing Campaign of Harassment led by the Defendants." DE No. 1, pp. 24,
No. 45.

95.  The complaint goes onto to detail out: "The amount of evidence dispels any
type of suggestion that Plaintiff's plight arose from a single instance of type
of negligence or ineptitude, rather, Plaintiff is challenging a pattern of con-
duct, that simply amounts to a policy, whereby prison officials have consciously
ignored the ongoing Campaign of Harassment against the Plaintiff, for years."
DE No. 01, pp. 27, No. 65.

96.  This Honorable Court, after review of the Complaint & a Spears Hearing,
issued an ORDER that detailed out the removal of the original defendants, in
place of a single defendant (Current ML Warden), because he would fashion the

injunctive relief requested, if required. "Plaintiff seeks injunctive relief with respect to his allegations of a retalitory campaign of harassment. Plaintiff names eight defendants in his original complaint, but none of the named defendants singularly orchestrated the retaliation or participated in all of the incidents." DE No. 10, pp. 11, paragraph 2.

97. It is clear throughtout the course of the litigation in this case, the multiple ORDERS, the multiple responses by the Defendant, the filings of the Plaintiff, that I was subjected to adverse actions that included, but are not limited to the following list:

    a) the filing of false disciplinary cases;

    b) the filing of retalitory disciplinary cases;

    c) forcibly being restrained so that my religious beard could be removed;

    d) the denial of a medical lay-in, which caused a delay in fixing glasses;

    e) the confiscation and/or destruction of legal materials;

    f) the confiscation and/or destruction of legal books;

    g) the denial of scheduled legal visits;

    h) refusal to investigate ombudsman complaints;

    i) improper findings of guilt in disciplinary cases;

    j) interference with witnesses in an ombudsman complaint;

    k) the failure of Wardens to take any action to correct the retalitory conduct committed by unit staff; and

    l) the occassional denial of food, showers, and medicine.

SEE DE No's 10, 20, 40, 70, and 82, for examples.

98. What was not clear at the time, due to the Plaintiff's PRO SE status, and not understanding the relevance at the time of filing, was what officers had actually orchestrated the ongoing Campaign of Harassment to begin with, and how that knowledge was instrumental to this case.

PAGE 18

99.   So I will explain that now so the Court & Defendant can see the relevance of who was at fault, who orchestrated the Campaign of Harassment from the start, and why the campaign began to begin with.

100.   When I arrived on the McConnell Unit in May of 2011, I immediately went to the unit Law Library to start researching my criminal convictions, for my pursuit of justice in my innocence. While I was there I met an inmate named Michael Lamb, TDCJ# 0790214, who was visiting with three 'Jail-house Lawyers' over his case he had in this Court, they were MICHAEL MCCANN, TDCJ# 879919, ANTONIO LACY, TDCJ# 0594575, & MICHAEL GARRETT, TDCJ# 0697364.

101.   When I had explained that I had been studying the law myself for over six years, Mr. Lamb asked for my assistance as well. He explained to me that they had just sent in a Amended Complaint trying to get some of his Defendants put back into the lawsuit that had been originally dismissed. He then asked me to review all of his documents so far, and I agreed to.

102.   I assisted him with the writing of multiple motions & supplements in the law library, which were filed into this Court. SEE: EXHIBIT QQ, Docket for case 2:11-CV-027 - LAMB v. CRITES. I helped write DE No's 31, 32, 35, 38, 39, 40, 46, 53, 61, 67, 70, 72, and 72 got him counsel appointed to the case.

103.   Now at the time I was brand new to TDCJ, coming from Federal prison, and I was naive to the fact that by my helping other inmates I could be retaliated on myself. I thought the fear of retaliation was reserved for inmates who had actually filed grievances, and lawsuits. I was dead wrong on that.

104.   MICHAEL MCCANN informed me later about how he heard CANDACE MOORE telling MAJOR ADAM GONZALEZ about how we were helping MICHAEL LAMB, and since I did not at the time understand the signifcance of that, I ignored it.

105.   While in the Law Library, and again outside of the law library I was also helping WILLIE GARNER, with multiple lawsuits, one being for his right to wear

a beard as he was a Muslim, and then his retaliation suit as well. SEE: EXHIBIT
V, Affidavit & Order from case 2:11-CV-320 - GARNER v. GUTTIERREZ. I also was
helping him with both cases, the case in the Fifth Circuit, and helped write
multiple DE No's in that case as well.

106.   Through 2011-2013 I was assisting these above two inmates, and then later
started assisting one ROBERT SHIELDS in his case. SEE: EXHIBIT W, Affidavit &
Order from case 2:12-CV319 - SHIELDS v. THALER. Basically, all of these cases
had one serious element that tied them together: MAJOR ADAM GONZALEZ.

107.   At the time MAJOR GONZALEZ was running a known 'snitch' program, that if
you did not cooperate with him, you were set up for retaliation. He also was
targetting inmates that litigated their issues, in either State or Federal
courts of law.

108.   He would specifically target inmates that were not in gangs, who are 'solo'
and would need his protection if word got out about them, and their being in a
'snitch' program of his. SHIELDS was just one of those men.

109.   The other unit Major one EVELYN CASTRO, and a CPT. JACQUELYN JAMESON were
his enforcers, who continued to ensure retaliation continued against these men.
I watched both of them (females) force SHIELDS against a wall and pat search
him in a manner that was NOT by policy, and in fact was assault. He was shoved
against the wall, his head was slammed into the wall, his legs were kicked to
the side, and when he became unbalanced from that, he was thrown to the ground.
At no time did he resist, at no time did he give them reason to do so, and all
we had done was walk out of law library together.

110.   Now that CANDACE MOORE (Law Librarian) had made it common knowledge that
I was assisting all these men to MAJOR ADAM GONZALEZ & MAJOR EVELYN CASTRO, I
was then targetted behind both of them orchestrating a comprehensive, retalit-
ory, ongoing campaign of harassment, that allowed them and CPT. JACQUELYN JAME-

SON, CPT. JAMES THOMPSON (original defendant), SGT. BILLY GARZA, CO SALLY DUP-
NIK, CO KRISTINE ZAMBRANO, CANDACE MOORE (Law Librarian), & a few others to
target me for retaliation.

111.  MAJORS GONZALEZ & CASTRO would threaten me personally, repeatedly, for my
assisting the other inmates, they would search my cell, tear it apart, destroy
legal papers, and confiscate my personal property for no reason. SEE EXHIBITS
SS, TT, & UU.

112.  On August 23, 2012, I watched CPT. JAMESON & 2 officers beat a handcuffed
inmate unconscious, while ADAM GONZALEZ watched. The inmate was clearly not con-
scious as he stopped trying to roll around to protect himself as JAMESON kicked
him in the head. If my records of this event had not been stolen by GONZALEZ I
could tell you his name & number, his nickname was "Ya-Ya" & he was a muslim.

113.  That same inmate would be assaulted again in 2017, left in the cell and
died the day before Mother's day of 2017 or 2018. The Law Librarian kept all
my notes of that when she took all my legal papers, along with witness state-
ments I was about to send to his family.

114.  I remember it being the day or two before Mother's day, as his mother was
coming to see him for the first time in years, unknown to TDCJ staff & him both,
and they had to tell her at visitation that her son was dead.

115.  When he was killed I made my decision to litigate everything that was
going in the unit that violated our constitutional rights, expose anything and
everything to the police or law enforcement, and stop staff from retaliating,
even it meant my death.

116.  Now back to 2012, I was repeatedly threatened by GONZALEZ & CASTRO with
physical harm, once GONZALEZ found out I watched the assault on "Ya-Ya", I
guess he thought it would scare me into shutting up, like he wanted.

117. CASTRO made threats personally to me about litigation, in regards to my never including her in anything I was assisting other inmates with, or for myself as well. At the time I had not done so yet, and made sure she knew that.

118. GONZALEZ was out of control though, and his threats turned real. He and CPT. JAMESON put a "hit" on me, that was distributed to the gangs, who made copies of it, passed it around, made threats to me over the it, and it did in fact state the following: **"I want Fred on a fucking helicopter ride out of here, or something of the same that makes sure he gets off the fucking unit. Take care of this shit now. Whoever gets it done has a get out of jail card & more for himself and his homeboys. You fucking know who."** I copied this kite into the grievance I filed in 2013. SEE EXHIBIT UU.

119. Now while I cannot prove GONZALEZ wrote the kite, the intent of it was clear, and all the gangs took it as true. They acted on it, they copied it, and intended to act on it. The ONLY reason they did not, was senior gang members saw I had got two gang members released from prison, that I was doing a lot of good with the lawsuits I was helping on, and they countermanded the "SOS" (smash on site) that was originally put on me over the kite from GONZALEZ.

120. At this time please read EXHIBITS SS, TT, and UU, all of which were filed against MAJOR ADAM GONZALEZ, and two were filed against MAJOR EVELYN CASTRO. I ended up getting tired of the threats from GONZALEZ and filed suit against him over EXHIBIT TT, in the case described in EXHIBIT X.

121. GONZALEZ and CASTRO caused me so much stress & harm over those years, that they got me to stop helping other inmates, with lawsuits; I stopped helping with the filing of grievances, I stopped trying to contact the press, and I curbed my efforts after they once again stole my legal papers & destroyed my cell.

122. After I filed the grievance over the suit in EXHIBIT X, I was hit with retalitory cell searches on: 3/01/13, 03/07/13, 03/13/13, 03/17/13, 03/22/13, and

03/28/13; with some of them having GONZALEZ, CASTRO, DUPNIK, and JAMESON there themselves at the search. My property was torn apart each time, legal work was destroyed, and my cellmates property was never touched once.

123.  During all this time GONZALEZ repeatedly threatened me over my grievances specifically, I was given free reign to file against the mailroom for issues, because according to GONZALEZ: **"Their fucking office got my boy fired, fuck them bitches in there.",** as he was referring to the former mailroom supervisor a Mr. Cesar Diaz, who was fired for stealing inmates mail & selling it.

124.  I was also allowed to file grievances against staff for property issues, as per GONZALEZ himself: **"Yeah, I dont give a shit about that, shit goes miss-ing here all the time, ... chuckling ... "You should know all about that.",** but was curtailed from filing anything else. Every once and awhile I would slip one in on something else, but that was rare.

125.  So from 2011-2014, the first four years I was on the unit with GONZALEZ and CASTRO, I was limited to the filing of twenty-two (22) grievances that were actually logged & investigated, that does not count the ones they just threw away, and half of them were against the mailroom. This is when I started to document my personal & legal mail going missing REPEATEDLY, by the mailroom. Ten of the twenty-two grievances are property claims, from the retalitory cell searches and more. Almost every STEP 2 filed against GONZALEZ, CASTRO, THOMPSON, and DUPNIK were never returned.

126.  After watching JAMESON beat that man while handcuffed, I never filed a single grievance against her, I was to scared to deal with that level of re-taliation. Plus, I saw what she did to LAMB, GARNER, and SHIELDS.

127.  Please take a look at EXHIBITS A & B now. You will see my grievance his-tory and disciplinary history, based off this ongoing campaign of harassment. All of this harassment was orchestrated by GONZALEZ and CASTRO. JAMESON and

THOMPSON (original defendant) enforced it, and with the help of DUPNIK carried out alot of the cell searches & other acts of retaliation.

128.  However, CASTRO & GONZALEZ personally threatened me, searched my cell in retaliation, conficated personal property, destroyed legal papers in LAMB's, GARNER's, SHIELD's, and my lawsuits, refused to investigate my complaints, refused to investigate a felony theft, and GONZALEZ himself put a "hit" on me.

129.  I have done my best to document all of this over the years, especially with having to deal with CANDACE MOORE (Law Librarian) and others, stealing my notes, calendars, and more.

130.  I ended up having a four visit with my mother Rosanna Hightower on 5/25/13 and another on 5/26/13 for another four hours; followed by four visits with my wife Debbie Anderson on 6/01/13 and 6/02/13, in which I told them about what is going on with CASTRO and GONZALEZ, and they begged me to leave it alone. I had sent letters to both over what I was dealing with, and my mother came from the State of California to see me, and my wife from Dallas.

131.  I refused to listen to them, knew my civil rights had been violated, and filed suit in State court by mailing my complaint on 06/28/13. EXHIBITS X & TT.

132.  I also detailed out everything CASTRO & GONZALEZ were up to in regards to both me and other inmates in two detailed letters mailed to Senator Whitmire on 01/07/2014.

133.  Both CASTRO & GONZALEZ would be removed from the McConnell Unit in 2014, after CASTRO had another DUI, got bailed out by the Asst. Regional IV Director, and GONZALEZ had according to staff **"...too much going on here."** as the reason for his leaving. This however did NOTHING to stop the ongoing campaign of harassment set in place by both of them, and has continued till this day.

134.  So imagine my shock in March 2020, when CASTRO returned as Head Warden for the McConnell Unit, and she intensified the campaign of harassment herself.

135.  With her arrival back on the unit, she ensured new acts of retaliation
took place that brought this campaign of harassment to whole new level, in:

   a) I am purposely denied access to the 'respite' areas on the unit for
      the first time in years, per CASTRO's instructions at shift change
      meetings (per admissions made by staff to me), which forces me to
      suffer my first heat induced seizures in years;

   b) my legal mail is targetted, opened, read, & utilized for strategic
      gain in an act that breaches attorney-client privilege in case no.
      2:18-CV-328; and

   c) being openingly targetted by staff at CASTRO's instructions again,
      for my organizing class action styled lawsuits over the COVID-19
      pandemic, and how she handled it.

136.  However, the difference between now and in 2014, is that she did not
realize that I am tracking everything, multiple officers who are sincere &
honest, are making statement on my behalf, I file grievances for any types of
misconduct now, and I will litigate myself for violations of my civil rights &
that of others as needed.

137.  In fact, when I was being denied or ordered out of respite areas in 2020,
at her orders to staff, multiple officers refused to cooperate with that, and
in danger of retaliation themselves, COUNTERMANDED the orders to remove me
from respite areas, they are: SGT. NAVARRO, SGT. DAUGHERTERY, SGT. BRAKO (SAFE
prisons SGT), SGT. HOLDERFIELD, and LT. WEST.

138.  On 01/19/21 I am put on 'chain' and being told I ambeing moved to the Bill
Clements Unit for heat restrictions, after a 5 hour bus ride, the Darrington
Unit refuses to house me, and returns me to the McConnell Unit. My property is
held and refused to return it, even though I am dealing with court deadlines.

139.  So a ombudsman complaint is filed, CASTRO tells me to my face I am not
getting it back on 1/22/21, and MAJOR DELAPP intervenes to get back to me.

PAGE 25

140. On 02/03/21 I am put on 'chain' again and told I am being moved to the Bill Clements Unit again for heat restrictions, and I immediately begin my requests for rank. The reason is that my assigned counsel in case 328, had contacted the Asst. Atty. General in that case, and had told my mother that I was not supposed to be shipped off the McConnell Unit.

141. My requests for rank are met with an answer of: **"We called Warden Castro at home, she said there is no court order keeping you here, and that if you refuse to get on the bus, we are to force you."** I ask them what do you mean **"force me?"** The response is: **"We will pack your property ourselves, & good luck on it all arriving there, we will gas you, and gag you if needed."** Needless to say I started packing my own property myself, and requested to speak to CPT. TREVINO who was in charge of the ACTIVE Ombudsman investigation for the first attempt to move me on 1/19/21.

142. CPT. TREVINO admits to me herself that there is nothing she can do, if I cannot show her a court order, and not the email from my counsel.

143. Once I am taken off my building I am forced to leave behind my property, and that is the last time I ever see it ALL together in one place again. As I am being escorted by the 'chain' officer one CO RANGEL, I am talking to him about my being moved twice in the past 2 weeks and my complaints over it. He looks at me and says: **"Yeah I hear Bill Clements sucks ass, and it took Castro's ass pulling some major strings in Huntsville to pull the shit off."** I look at him in shock and request rank again.

144. CO RANGEL does not understand why this has made me so upset, but refuses to get me rank again. He then seperates me from all my property (1 bag & headphones) and throws me in a locked cage in the Administrative Segregation bldg. He does not want me talking to rank, after what he said, and instructs staff back there not to talk to me or let me out of the cage. I am kept there until the bus arrives, and barred from contacting rank again on the ML Unit.

145.  I am shuttled from one unit to another for the next six days, and arrive at the Bill Clements UNit on 02/08/21. Upon my arrival I am immediately requesting to speak to rank, over the situation, before I am even housed. I am then seperated from the rest of the inmates on the bus with me, put in a locked holding cell in the administration building for hours, while I wait.

146.  One thing that had been given to me upon arrival was a copy of the Bill Clements Unit Orientation Handbook, so the first thing I did was open it to see if I knew any of the ranking members of the administration, or the department heads. I did not recognize a single name on the list, and the Head Warden was listed as WARDEN RICHERSON.

147.  After waiting a couple of hours to talk to a member of rank, I am let out of the holding cell, told I will not be seeing anyone, and escorted to the BC administrative segregation building to be housed.

148.  Over the course of the next couple of weeks I would deal with serious levels of animosity from officers, ranking officers, and inmates; who all seemed to know about me being a 'Jail-House Lawyer'. I am even physically assaulted by one of the inmates as well, as I deal with threats & more from officers and inmates, that I should get myself off the unit and I should not engage in any 'Jail-House Lawyering' while on the BC UNit. This is detailed out in DE No. 102.

149.  The only thing that saves me is this, one of the senior ranking gang members who used to be on the McConnell Unit with me is now here, and he put a stop to the immediate harassment, from inmates.

150.  So that makes twice that a prison gang member has to save me from the acts of a TDCJ officer, which is absolutely ridiculous. It should be the other way around, but not in TDCJ, and not when dealing with staff who are protected.

151. I am eventually moved to the HIGH SECURITY building for a cell with air-conditioning in it, which takes me all the way to level (2) housing, and has

me locked in a cell for 22 hours a day, versus the fact if I were on the ML
Unit right now, I would have been locked up 8 hours a day. This does not
include the rights and privileges I have earned as well, which are detailed
out in DE No. 102, pp. 35, that I am denied as well.

152. On 2/26/21 I am denied a attorney-client call with Mr. De La Garza for
us to prepare for a hearing on March 3, 2021. At this time I have not received
one piece of legal mail since my arrival either.

153. On 2/27/21 I am interviewed by CPT. MELENDREZ for one of my Ombudsman
interviews, over the retalitory move itself. While we are talking for a little
more than thirty minutes, he is interrupted with a phone call. This is what I
hear from my end:

> "...Yeah, I got to thank you for giving me this one, its insane"
>
> "...Yeah he is here right now with me"..(listens)....laughs...
> "no way are you serious...."
>
> "...well I can tell this is going to take me a minute..."
>
> "...he did that?..."

followed by their discussing some issues at work, and then ending the call.

154. This whole scenerio puzzles me and I ask who he was talking to, he says:
"Oh, that was just the Head Warden." I respond with: "How the heck does Warden
Richerson know who I am, it sounded like he knew of me from the call? Then the
Captain responds with: "Oh no, our Head Warden is Gonzalez, not Richerson, he
left." ... "Trust me, Warden Gonzalez knows exactly who you are."

155. This again is puzzling to me as I do not know a Warden Gonzalez, but since
it is a common name, I start to think one of the Captains from the McConnell
Unit might have made Warden.

156. Next, CPT. MELENDREZ hands me a copy of the Ombudsman complaint and asks
me for my statement for it, what he did not notice was that an email from the

PAGE 28

Ombudsman office was stuck to the bottom of it. I look at it and my heart just freezes up, when I see the Head Warden's full name is ADAM RENE GONZALEZ, and I had not had to deal with that name since 2014.

157. The reason I never let it cross my mind that it was ADAM GONZALEZ was the fact that years ago McConnell Unit staff were telling inmates that both ADAM GONZALEZ and CPT. JAMESON were fired from TDCJ, for their involvement in the wrongful death complaint against them for an officer being killed on their new unit, so I had no idea he even still worked for TDCJ.

158. These are some of the adverse actions I have been subjected to since my arrival at the BC Unit, but are not limited to the following list:

    a) the filing of false disciplinary cases (Ombudsman complaint filed);

    b) the filing of retalitory disciplinary cases (Ombudsman complaint & also a STEP 1 Grievance filed);

    c) exposure & directly shining of strobe-capable flashlights into my face on a daily basis (Ombudsman complaint & STEP 2 Grievance filed);

    d) exposure to beams from regular flashlights into my face on a daily basis (Ombudsman complaint and STEP 2 Grievance filed);

    e) being placed in a cell that is illuminated one way or the other 24 hours a day, with repeated turing off/on of cell lights (Ombudsman complaint & STEP 2 Grievance filed);

    f) the denial of a medical lay-in, for an eye-exam for new glasses, since mine are six years old, and I have to take them off to read now (this one only has an Ombudsman complaint filed so far, due to limits on GRV's);

    g) the confiscation and/or destruction of legal materials (Ombudsman level complaint filed & STEP 1 Grievance property claim);

    h) the confiscation and/or destruction of legal books (Ombudsman complaint & STEP 1 Grievance filed);

    i) the denial of an attorney-client call, prior to hearing on 3/3/21 (STEP 2 Grievance filed & Ombudsman complaint);

    j) the denial of all legal mail for weeks, prior to hearing on 3/3/21, also repeated delays in sending & receiving of legal mail (Grievance filed);

k) refusal to investigate ombudsman complaints;

l) the failure of Wardens to take any action to correct the retalitory conduct committed by unit staff;

m) while reporting staff misconduct to one officer, another is pointing her flashlight directly into my eyes, turning it off/on real fast, trying to induce a seizure in me purposely for reporting misconduct (Ombudsman complaint & STEP 1 Grievance filed); and

n) the occasional denial of food, denial of hot food, denial of healthy food, and medicine. (Ombudsman complaint filed).

SEE EXHIBITS BB, CC, DD, EE, FF, VV, and WW.

159.  Now I would like you to compare that list against the list from the suit at bar in No. 97 on page 18 of this affidavit, then I would like you to compare it to DE No. 1, 10, 20, 40, 70, and 82, for comparisons as well.

160.  The truth of the matter is this, ADAM GONZALEZ and EVELYN CASTRO started and orchestrated this ongoing Campaign of Harassment against me, and picked it right back up as the Head Wardens of the McConnell & Bill Clements Unit. It is obvious that they have learned nothing in the past years we were seperated, but now hold an even more immense power over the situation, that allows them to cover up whatever they want to.

161.  The Defendant wants us to believe that because I was moved the case is now MOOT, but this is just CASTRO manipulating the situation, and throwing me back at GONZALEZ for their enjoyment, & in an act of retaliation.

162.  Even if GONZALEZ was not on the BC Unit, but all of this was still happening to me here, it is obvious even to me as a layman, that this case is not moot.

163.  Head Wardens hold an immense amount of power, are rarely dealt with in regards to misconduct violations, and it take us few years to try and litigate one claim to a jury trial for relief, something most inmates cannot do.

164.  This is why I filed my Motions for Amending the complaint, a motion to Joinder GONZALEZ, and a motion to replace RICHARDSON with Director LORI DAVIS.

PAGE 30

### III. REQUIRED BACKGROUND ON THE "MCCONNELL TOP TEN" LIST

165.  Now I will very briefly go into the some of the background on a few of the Jailhouse Lawyers on the McConnell Unit, because this Court needs to see the pattern of abuse, in using retalitory transfers against us, all hidden as supposed transfers for medical issues, mainly heat scores.

166.  As I have been talking about from the beginning, watching TDCJ's reactions to suits for injunctive relief, it is 'business as usual' to move the Plaintiff to another unit to kill the suit. I knew this before I filed, which is why I mislead staff as to what I was suing for.

167.  I did not even discuss the amounts with my wife, mother, or Power of Attorney, because I did not want my phone calls which are recorded to reveal anything. If you ask any or all of them how much I am suing for right now, you will get three different answers.

168.  That is how I know for a fact that the breach of my attorney-client confidentiality caused this to be known to the McConnell Unit. As discussed in EXHIBITS 01-14, the amount of court costs & reimbursement that I came up with was $14,000 and some change.

169.  In late November 2020 and more in December 2020, unit staff started asking me why I only sued for $14,000.00, when they thought it was for way more. At first these questions shocked me, but then I just thought it was because my attorney had sent the demand to CASTRO's attorney, I was wrong.

170.  As you will clearly see in those EXHIBITS 01-14, I was the ONLY one that used that number, my counsel got the amount wrong on every version of the demand letter, so unit staff could not get it from reading his mail to me, and since he never sent the demand letter in its final form, the ONLY way to have unit staff know about the $14,000.00, is they had to breach my privilege and read it out of my mail to my attorney, which I have proved they did.

171.  This kind of conduct is sadly not out of the ordinary though in TDCJ, and especially with how Jailhouse Lawyers are treated, especially by CASTRO, and Wardens like her.

172.  They believe under the misguided concept, and antiquated concept, that they must protect all staff from Jailhouse Lawyers, including themselves. It does not matter one bit, if the allegations are true or not, the Wardens like CASTRO & GONZALEZ feel they will lose respect from their staff, if they do not protect their staff. They fear losing that respect, because they do not know who might be their back-up in responding to an out of control inmate, or who might have to back up one of their bogus stories for Regional staff.

173.  On the McConnell Unit we had for years a group of Jail-House Lawyers that inmates all over the unit called the "MCCONNELL TOP TEN", which was a list of Jailhouse Lawyers, that had won cases for themselves, won cases for others, had got inmates released from prison altogether, affected positive change on the unit, organized petitions, organized class action style lawsuits, like the one for HEP C patients now, and much more.

174.  This group of Jail-House Lawyers consisted of the following men:

　　　　1)  MICHAEL MCCANN, TDCJ# 879919, Plaintiff in 2:20-CV-139;

　　　　2)  MICHAEL GARRETT, TDCJ# 697364, Plaintiff in 2:13-CV-070, which was just remanded again;

　　　　3)  FRED HOFFMAN, TDCJ# 1662898, Plaintiff in 2:18-CV-328, and in 2:18-CV-333;

　　　　4)  ANTONIO LACY, TDCJ# 594575;

　　　　5)  JIM HAMILTON, TDCJ# 1079035;

　　　　6)  JAMES HALSELL, TDCJ# 2122411;

　　　　7)  GERALD DURDEN, TDCJ# 1121671;

　　　　8)  RANDY WILLIAMS, TDCJ# 401747;

　　　　9)  DANIEL SANCHEZ, TDCJ# 1288875; and

　　　　10)  "TIM" - lost his name & number when my property arrived not intact to the BC Unit.

175. Over the past 18-24 months, with me being the last one, the entire TOP TEN group was purged from the McConnell Unit, in retalitory transfers, and every single one of them disguised as for "medical reasons" or heat restrict-ions & heat sensitivity scores.

176. That is why I tried to stay on top of my medications, restrictions, and tried everything I could to prevent a retalitory transfer for a fake medical reason. I just watched the other nine men get purged from the unit, retaliated on and much more.

177. There is no way anyone is going to convince me that we all just became un-healthy one after the other, to where we could no longer live on the ML Unit, that is ridiculous.

178. The McConnell Unit is a geriatric Level One medical facility with 24 hour medical care, and multiple medical providers. It also has a full mental health staff that outdoes the one at the Bill Clements Unit. It has air-conditioned cells in AD-Seg, which are used for regular inmates & overflow inmates on a daily basis, not just the types of inmates described in the Defendant's motion and affidavit.

179. There was no true OBJECTIVE reason to move any of us, and if I was a true risk I would have been moved back in 2018, when my scores were the highest ever. Not now, after a breach in attorney-client confidentiality allowed TDCJ staff to see my strategy with counsel, to notice I was receiving injunctive relief only, and used that information to their benefit.

180. What happened was CASTRO was able to use her position to move me,  and she was able to throw me back to her old partner GONZALEZ on top of that, who allows the ongoing campaign of harassment to continue on the BC Unit.

181. There is absolutely nothing MOOT about this case, especially with an act of retaliation being the cause for the move itself, and then followed by

PAGE 33

the continuation of the ongoing Campaign of Harassment, by staff on both units. I have only been on the Bill Clements Unit for less than 90 days, and have been subjected to treatment that is out of control.

182.  The foregoing allegations are factual and create a genuine issue of material fact which will be proven beyond doubt at trial, support a judgment in my favor, as explained in the Memorandum submitted with this declaration.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


DATED: 04/26/2021

FRED HOFFMAN, III, PRO SE
TDCJ# 1662898
DECLARANT
Bill Clements Unit
9601 Spur 591
Amarillo, Texas 79107

PAGE 34